GIBBS LAW GROUP LLP
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
Amy Zeman (SBN 273100)
Aaron Blumenthal (SBN 310605)
505 14th Street, Suite 1110
Oakland, CA  94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
ehg@classlawgroup.com
mls@classlawgroup.com
amz@classlawgroup.com
ab@classlawgroup.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Brian Brach, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Wells Fargo & Co., Wells Fargo Bank, N.A., and Wells Fargo Home Mortgage,<br><br>Defendants. | Case No. 17-cv-05990<br><br>**CLASS ACTION COMPLAINT**<br><br><u>**JURY TRIAL DEMANDED**</u> |

# INTRODUCTION

1. This action addresses the third in a series of fraudulent business practices that Wells Fargo has inflicted on its banking customers. First, in 2016, the story broke that Wells Fargo employees had opened millions of fraudulent accounts in customers' names. Driven by intense pressure to meet Wells Fargo's unrealistic performance goals, employees opened fraudulent checking accounts, savings accounts, and credit accounts in customers' names. Customers were often charged fees for opening and maintaining accounts that they didn't authorize or even know about.

2. Then in 2017, another scandal broke that rattled Wells Fargo. Insurance brokers working at the bank's behest had forced unwanted car insurance on automobile loan borrowers. These borrowers were forced to pay for insurance they didn't want or need, since they already had their own insurance policies. The insurance brokers received commissions for forcing this undesired and redundant insurance on Wells Fargo's customers.

3. Now, this action arises from yet another revelation about the unscrupulous practices of Wells Fargo employees. Wells Fargo offered its mortgage applicants a locked-in interest rate for a set period of time, usually 60 days. If it took Wells Fargo longer than 60 days to process the application, Wells Fargo was supposed to pay a fee to extend the locked in rate. Wells Fargo's policy was to pass this fee on to the borrower only if the borrower was at fault for delaying the application process.

4. Loan officers and managers, however, had their performance numbers impacted if the bank paid the extension fees. Lower performance numbers meant less incentive pay. Employees in the mortgage department would thus place blame for delays on Wells Fargo customers when, in reality, it was Wells Fargo that triggered delays. By blaming the customer, Wells Fargo was able to shift the responsibility for paying extension fees from itself to its customers. Numerous former Wells Fargo employees have come forward—in a letter to Congress, a whistleblower complaint, and interviews with the media—to reveal that they observed a systematic practice of fraudulently charging extension fees to customers when delays in the application process were not the customers' fault. As a result, Wells Fargo wrongfully

collected millions of dollars in extension fees.

5. As Forbes writes, "Every tale of corporate scandal begins with culture—and Wells Fargo's culture … made it the kind of place where frontline employees could feel ungoverned and libertine enough to fabricate millions of customer accounts." The same cutthroat corporate culture that led to the account opening fraud also led to shifting blame, and, consequently, payment responsibility, to customers for delays in mortgage application processing. By doing so, Wells Fargo employees were able to maintain their performance numbers and secure their incentive pay at the expense of Wells Fargo customers.

## PARTIES

6. Plaintiff Brian Brach, a natural person, is a resident and citizen of New Jersey.

7. Defendant Wells Fargo & Co. is incorporated in Delaware with its principal place of business in San Francisco, California.

8. Defendant Wells Fargo Bank, N.A. is a national banking association chartered under the laws of the United States with its principal place of business in Sioux Falls, South Dakota. Wells Fargo Bank, N.A. is Wells Fargo & Co.'s principal subsidiary and is the successor by merger to Wells Fargo Home Mortgage, Inc.

9. Defendant Wells Fargo Home Mortgage is currently a division of Wells Fargo Bank, N.A. and has its principal place of business in Des Moines, Iowa.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from at least one defendant, there are 100 or more Class members, and the aggregate amount in controversy is greater than $5 million.

11. This Court has personal jurisdiction over Defendants because they are at home in California and the claims for relief relate to Defendants' acts and omissions directed to, emanating from, and occurring within California.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1931(b)(3) because the Court has personal jurisdiction over Defendants, a substantial portion of the alleged wrongdoing

occurred in this District, and Defendants have sufficient contacts with this District.

13. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims arose in this District.

**INTRADISTRICT ASSIGNMENT**

14. Assignment to the San Francisco Division is proper because a substantial part of the events and omissions which gave rise to the claims occurred at Wells Fargo's headquarters in San Francisco at 420 Montgomery Street.

**FACTUAL ALLEGATIONS**

I. **Overview of Rate Lock Fees**

15. Prospective mortgage borrowers typically seek the lowest possible interest rate. Even slight changes in the interest rate can make a substantial difference. The average borrower can save approximately $32,000 over the life of their mortgage by reducing their interest rate by only 0.5%.[1]

16. When prospective borrowers apply for a mortgage, they receive a quoted interest rate. The quoted rate depends on the applicant's creditworthiness, plus overall market conditions. But, market conditions can change, and mortgage applications take time to process. Interest rates may substantially rise while the application is pending. To protect against this possibility, lenders like Wells Fargo offer applicants the option to lock in their interest rates for a set period, typically 60 or 90 days.[2]

17. When the application process takes longer than 60 to 90 days, the rate lock expires. The rate lock can be extended further, but for a fee. Industry standard practice is that the lender pays the extension fee when *it* is at fault for delays in the application process.[3]

---

[1] The average mortgage in 2017 was approximately $309,000, over a 30-year term, with an interest rate of 4.1 percent. *See* Jonathan Wathen, *Here's the Size of the Average American's Mortgage*, The Motley Fool (Feb. 25, 2017), https://goo.gl/annyqS. Reducing this interest rate to 3.6 percent would save approximately $32,000 over the repayment term.

[2] https://www.wellsfargo.com/mortgage/tools/faqs/.

[3] http://www.thetruthaboutmortgage.com/mortgage-rate-lock/.

  II. **Wells Fargo Is At Fault for Most Delays in Mortgage Processing**

  18. Wells Fargo claims, on its website, that it usually finishes processing its mortgage applications before the rate lock expires.[4]

  19. Not so, says a former loan officer at Wells Fargo, Frank Chavez. In a letter to the House and Senate banking committees, Chavez wrote that Wells Fargo frequently missed the rate lock expiration deadline due to a "backlog of mortgage loan applications." Former employees of Wells Fargo, interviewed by *ProPublica*, said the delays in processing mortgage applications were due to "the inexperience and low pay of the processing and underwriting staff," and "to keep costs down, the bank understaffed the offices."[5] Chavez says that "the vast majority of delays" were the fault of Wells Fargo, caused by "underwriting backlogs, loan processing backlogs, [or] other circumstances outside the control of the customer/borrower."

  III. **A Cutthroat Corporate Culture Caused Employees to Falsify Records to Charge Extension Fees to Customers**

  20. It is standard in the industry for banks to pay the extension fee when they are responsible for delays that make the extension necessary. Consistent with this custom, Wells Fargo has a policy of covering extension fees in cases where the company is primarily responsible for the delays that necessitated the extension.

  21. Wells Fargo's managers, however, were not happy when the bank had to pay extension fees because it hurt their branch's numbers. *ProPublica* reports, based on interviews with two former Wells Fargo employees, that managers' bonuses "took a hit if the bank paid out too many extension fees."[6] One employee said, managers would emphasize during branch meetings that "extensions were costing the branch money."[7] Managers made clear that extension

---

[4] *Id*. ("closing generally occurs within the rate-lock period").

[5] Jesse Eisinger, *Here's Another Way Wells Fargo Took Advantage Of Customers*, ProPublica (Jan. 23, 2017), https://www.propublica.org/article/heres-another-way-wells-fargo-took-advantage-of-customers.

[6] Jesse Eisinger, ProPublica, *supra* note 5.

[7] *Id*.

fees were to be "'Borrower paid,' never 'Lender paid.'"[8]

22. The culture at Wells Fargo put tremendous pressure on employees to meet performance goals. *The Los Angeles Times* reported that Wells Fargo had a corporate culture that put "relentless pressure" on employees to hit performance targets, which "led to ethical breaches."[9] Allegations came to light in 2016 that Wells Fargo employees had opened millions of fraudulent checking, savings, and credit accounts in customers' names.[10] In all, the bank estimates, its employees opened 3.5 million unauthorized accounts, without customers knowing.[11]

23. Similarly, because rate lock fees affected a branch's numbers, Chavez says, there was a "systematic effort" to force customers to pay rate lock extension fees, "which Wells Fargo should have paid out of its own pocket."

24. Mauricio Alaniz, a former Wells Fargo employee, who alleges he was fired for blowing the whistle about the extension fee scheme, says that "[Wells Fargo Home Mortgage] employees would conceal the true reason for the delay and would falsify internal records to make it appear as if the delays were the fault of the customer. For example, [Wells Fargo Home Mortgage] underwriters and processors would falsely mark a file as having missing or incomplete customer information despite the fact that the information had already been fully provided by the customer. [Wells Fargo Home Mortgage] employees would also classify delays as 'customer-caused' or 'customer-related' even if the delay was actually caused by the [Wells Fargo Home Mortgage] employee failing to timely request, pass-on, or process customer information."

25. Chavez says that the "most blatant methods of attempting to transfer blame onto customers" for "expected future delays" was to have loan processors flag "the file for 'missing'

---

[8] *Id.*

[9] Bethany McLean, *How Wells Fargo's Cutthroat Corporate Culture Allegedly Drove Bankers to Fraud*, Vanity Fair (Summer 2017), https://www.vanityfair.com/news/2017/05/wells-fargo-corporate-culture-fraud.

[10] *Id.*

[11] Stacy Cowley, *Wells Fargo Review Finds 1.4 Million More Suspect Accounts*, N.Y. Times (Aug. 31, 2017), https://www.nytimes.com/2017/08/31/business/dealbook/wells-fargo-accounts.html.

5
CLASS ACTION COMPLAINT

customer documentation or information that had already been provided by the borrower." "The customers would have to refile, blowing the [rate lock] deadline," *ProPublica* notes.[12]

26. And *ProPublica* reports, "Sometimes loan officers would ask customers to submit extra documents that Wells Fargo did not need for its initial assessments, burdening them with paperwork to ensure they didn't meet the deadline."[13]

27. When customers missed the rate lock expiration deadline, the extension fees could be substantial. *The L.A. Times* reports, "Rate-lock fees can be significant, typically ranging from 0.125% to 0.25% of the total amount of a mortgage."[14] Because the fee is calculated as a percentage of total principal, and mortgage applicants often seek to borrow considerable amounts, the total dollar amount of extension fees can be in the thousands.[15]

28. Chavez writes, although the rate lock fee scheme is "more complicated and less intuitive than the Fraudulent Account Opening Scandal of earlier this year, I believe the damage done to Wells Fargo mortgage customers in this case is much, much more egregious."

## PLAINTIFF'S EXPERIENCE

29. On, March 24, 2008, Plaintiff Brian Brach sent his mortgage application to Wells Fargo, by both email and Federal Express. Mr. Brach applied for a Wells Fargo renovation mortgage, backed by the Federal Housing Administration. Wells Fargo estimated, on Mr. Brach's mortgage application, that the estimated processing time for the application would be 30 days, even though other Wells Fargo documents note that renovation loans take a "minimum" of 45 days to process. Mr. Brach's mortgage application says that Mr. Brach had a rate lock period of 60 days.

30. Mr. Brach provided the requested paperwork to Wells Fargo as quickly as reasonably possible. For example, Wells Fargo requested that Mr. Brach provided a "Work Write

---

[12] *Id.*

[13] *Id.*

[14] James Rufus Koren, *Wells Fargo stuck mortgage borrowers with extra fees, whistle-blower's lawsuit says*, Los Angeles Times (July 14, 2017), http://www.latimes.com/business/la-fi-wells-fargo-rate-lock-20170714-story.html.

[15] *See id.*

6
CLASS ACTION COMPLAINT

Up" showing the renovations that had been done on the house and the cost. Mr. Brach provided a Work Write Up the same day. When Wells Fargo identified a minor deficiency in the Work Write Up, Mr. Brach provided a revised Work Write Up the very next day.

31.     Wells Fargo was responsible for several delays during the mortgage application and underwriting process. On April 10, 2008, for example, Mr. Brach emailed Wells Fargo to say that he could not order the title work on the property until Wells Fargo provided him with a commitment letter. Wells Fargo did not respond to this email for two weeks. When Wells Fargo responded, Mr. Brach furnished the requested paperwork within one day. Wells Fargo took another eleven days to provide Mr. Brach with the commitment letter.

32.     If not for Wells Fargo's delays, closing would have occurred within the 60-day rate lock deadline listed on the mortgage application. Instead, closing occurred 81 days after Mr. Brach submitted his mortgage application.

33.     Wells Fargo's settlement papers indicated that the bank was charging Mr. Brach a rate lock extension fee of $915.92. To close, Mr. Brach had to pay this fee.

## CONSUMER COMPLAINTS

34.     Borrowers have long complained about Wells Fargo charging extension fees when Wells Fargo was at fault for delays. One consumer writes in 2008 that he paid $500 to extend his 30-day rate lock period, despite delays being Wells Fargo's fault: "Although I was ready to close well before the anticipated date, the 7 days that my consultant delayed relaying information to me coupled with the 14 days of the appraisal process lead to me not being able to close before the rate expired. I had no control over these situations as Wells Fargo had made all the arrangements."

35.     Another consumer writes in 2009 that he had to do "four rate extensions" because his loan officer was unresponsive to emails, and when he did receive emails, "there are misspellings and poor grammar." The consumer continued, "It's impossible to reach WF representatives by phone, and when I do, there is a series of mixed messages and confusion on their part. If I didn't have a low rate locked in, I would stop the process with WF and try refinancing through another bank/credit union."

36. Another consumer writes in 2010, "I am currently in the middle of obtaining a home mortgage through Wells Fargo. I had signed and locked the mortgage rate on June 28th and was told the closing date should be on or before July 15th. Today is August 23rd and I have not yet closed on the house. My rate expired on August 13 and was told that I had to extend the rate." She continues, "Here I am on the second … extension," and "it does not look like I will close" by the deadline. "All sorts of excuses are given. The loan officer wants me to do the leg work of calling the processing department and pushing them to do the deal. I am sick of this. I cannot even pull out of the deal at this point, if I do I will lose my closing costs."

## CLASS ALLEGATIONS

37. Pursuant to Federal Rule of Civil P. 23(b)(3), Plaintiff asserts claims on behalf of the following "Class": All persons in the United States who obtained a Wells Fargo mortgage and were charged fees to extend an interest rate lock period based on Wells Fargo's practice of delaying loan approval and charging customers rate lock extension fees. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

38. This action has been brought and may properly be maintained as a class action as it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(b)(3).

39. Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses, or modified in any other way.

40. Although the precise number of Class members is unknown and can only be determined through appropriate discovery, Plaintiff believes, and on that basis alleges, that the proposed Class is so numerous that joinder of all members would be impracticable.

41. Questions of law and fact common to the putative Class exist that predominate over questions affecting only individual members, including *inter alia*:

a. Whether Wells Fargo engaged in a systematic effort to shift the cost of extension fees to its customers for lender-caused delays;

b. Whether Wells Fargo created a high-pressure work environment that encouraged managers and employees to shift the cost of extension fees to its customers for lender-caused delays;

c. Whether Wells Fargo knew that employees were falsifying records to pass extension fees on to customers;

d. Whether Wells Fargo failed to enact policies and procedures to ensure that all extension fees charged to customers were legitimate;

e. Whether Wells Fargo engaged in unfair or deceptive conduct in originating or refinancing mortgages;

f. Whether Wells Fargo has been unjustly enriched;

g. Whether Wells Fargo breached the covenant of good faith and fair dealing;

h. Whether Plaintiff and the Class have suffered damages due to Wells Fargo's conduct, and the amount of such damages.

42. Plaintiff is a member of the putative Class. The claims asserted by the Plaintiff in this action are typical of the claims of the members of the putative Class, as the claims arise from the same course of conduct by the Defendants and the relief sought is common.

43. Plaintiff will fairly and adequately represent and protect the interests of the members of the putative Class, as his interests are coincident with, not antagonistic to, the other members of the Class.

44. Plaintiff has retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiff's counsel specifically has experience litigating some of the largest and most complex consumer class actions, including numerous consumer class actions in the Northern District of California.

45. Certification of the Class is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class

litigation superior to any other method available for the fair and efficient adjudication of these claims including consistency of adjudications. Absent a class action it would be highly unlikely that the members of the Class would be able to protect their own interests because the cost of litigation through individual lawsuits might exceed the expected recovery.

46. Certification of the Class is also appropriate pursuant to Fed. R. Civ. P. 23(b)(1), (b)(2), and/or (c)(4).

47. A class action is a superior method for the adjudication of the controversy in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense, and the burden on the courts that individual actions would create.

48. The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of the class action.

## TOLLING

49. In 2013, an *L.A. Times* investigation revealed that Wells Fargo placed intense pressure on employees to meet aggressive sales targets and oft impossible quotas. In 2015, a lawsuit by the Los Angeles city attorney prompted further investigation into Wells Fargo's sales practices and cutthroat corporate culture. The Consumer Financial Protection Bureau fined Wells Fargo $100 million, in September 2016, because Wells Fargo employees had opened millions of fraudulent accounts in customers' names. When the CFPB announced the fine, Wells Fargo issued a press release, saying that its own internal investigation revealed 2 million affected accounts "going back into 2011."[16] After increased public scrutiny, Wells Fargo investigated further, and eventually announced that 1.5 million additional accounts were affected going back

---

[16] Wells Fargo, *Wells Fargo Issues Statement on Agreements Related to Sales Practices* (Sept. 8, 2016), https://newsroom.wf.com/press-release/corporate-and-financial/wells-fargo-issues-statement-agreements-related-sales.

to 2009, "nearly doubling the time frame" during which the fraud occurred.[17]

50.     Then, in July 2017, *The N.Y. Times* reported on a leaked Wells Fargo internal report, which found that insurance brokers associated with the bank had forced unwanted and unneeded car insurance and premiums on over 800,000 of the bank's auto loan customers, and received commissions for doing so.[18]  The *N.Y. Times* piece spurred Wells Fargo to issue a press release, saying that it would issue refunds to some customers who were affected between 2012 and 2017.[19]  But, Wells Fargo's force placed insurance program dates back to 2006.[20]  Numerous consumers with loans from between 2006 and 2012 say Wells Fargo charged them for force placed insurance, even though they already had their own car insurance.[21] Wells Fargo has yet to admit any wrongdoing for the 2006-2012 period.

51.     In a now familiar pattern, *ProPublica* reported in 2017 that Wells Fargo employees had improperly charged mortgage applicants for missing the deadline on their interest rate locks, when it was the bank's fault for delays.[22] Wells Fargo reacted to the news by saying it would reimburse some customers who were affected between September 2013 to February 2017. Wells Fargo gave no reason for the September 2013 cutoff.

---

[17] Statement of Tim Sloan, Wells Fargo CEO, *Before the U.S. Senate Committee on Banking, Housing and Urban Affairs* (Oct. 3, 2017), https://goo.gl/Pokbjv.

[18] Gretchen Morgenson, *Wells Fargo Forced Unwanted Auto Insurance on Borrowers*, N.Y. Times (July 27, 2017).

[19] Wells Fargo, *Wells Fargo Announces Plan to Remediate Customers for Auto Insurance Coverage*, BusinessWire (July 27, 2017), https://goo.gl/pNgYVS.

[20] Morgenson, *supra* note 18.

[21] *See, e.g.,* https://goo.gl/Sz5HRj ("I too was bullied into that fraudulent auto insurance scheme when I took a title loan out for my vehicle back in 2008. I told Wells Fargo I already had sufficient auto insurance through Farmers in California, and they still ignored me and added their ratchet auto coverage to my monthly statements. And yes it did cause extreme hardship to pay the bill monthly, along with added late fees when I missed the due date, (plus I continued paying for my auto insurance through Farmers!) I made 54 payments to them with boosted added charges. I would absolutely love reparations for this horrific abuse."); https://goo.gl/2WzgwM (complaint from March 9, 2008: "Our experience is the same as others, this is obviously a well choreographed scam. In spite of initial demonstration of insurance coverage, a collateral policy was put in place and added to monthly charges.")

[22] Jesse Eisinger, ProPublica, *supra* note 5.

52. Patricia McCoy, a former Consumer Financial Protection Bureau mortgage official, stated that Wells Fargo's practices surrounding rate lock extension fees "fits a pattern," which could be seen only after the above scandals "came to light."[23] The recently revealed pattern, according to McCoy, is that "Wells Fargo had a business model … that emphasized generating fees charged to consumers under duplicitous circumstances simply for the sake of padding revenue."[24]

53. Wells Fargo's current CEO, in testimony to the Senate banking committee, called the task of unearthing the full extent of "instances of possible misconduct" at Wells Fargo and the "practices that could harm [its] customers" a "massive undertaking."[25]

54. Plaintiff and the Class could not have discovered, through reasonable diligence, that Wells Fargo's was systematically charging customers for rate lock extension fees, despite lender-caused delays. Evidence of the systematic nature of this practice was within Defendants' exclusive control. As a result, any applicable statutes of limitation are tolled.

55. In addition, any applicable statutes of limitation have been tolled by Wells Fargo's knowing, active, and fraudulent concealment of the facts alleged herein. Wells Fargo has reportedly known about the practice of wrongfully charging rate lock fees to borrowers, but has not publicly admitted the problem.

56. Additionally, Defendants were, and are, under a continuous duty to disclose to Plaintiff and the Class the true cost of financing a mortgage at Wells Fargo, including the likelihood that the bank's delays would result in the borrower being charged a fee to extend their locked interest rate. Wells Fargo did not make this disclosure, and Plaintiff and Class members reasonably relied on the bank's active concealment of the true nature of or basis for rate lock extension fees, which rendered the cost estimate in the mortgage application misleading. Based

---

[23] Matt Egan, *Wells Fargo wrongly hit homebuyers with fees to lock in mortgage rates*, CNN Money (Oct. 4, 2017), http://money.cnn.com/2017/10/04/investing/wells-fargo-mortgage-rate-lock-fees/index.html.

[24] *Id*.

[25] Statement of Tim Sloan, *supra* note 17.

on the foregoing, Wells Fargo is precluded by estoppel from relying on the statute of limitations defense.

### First Cause of Action
*Violation of Truth in Lending Act (TILA)*
(against all Defendants)

57. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

58. TILA requires that creditors provide residential mortgage borrowers with, among other things, a disclosure of finance charges and fees, and a good faith estimate of the costs of closing. *See* 15 U.S.C. § 1638(a).

59. Defendants are creditors within the meaning of TILA. *See* 15 U.S.C. § 1602(g).

60. Defendants violated TILA by failing to disclose to borrowers who obtained mortgage rate locks that Wells Fargo was likely to charge them a fee for extending the rate lock. This charge was likely due to the prevalence of lender-caused delays at Wells Fargo.

61. Plaintiff and the Class have been injured and suffered monetary losses due to Wells Fargo's violations of TILA.

62. Plaintiff and the Class are entitled to actual and/or statutory damages, attorney's fees, and costs, pursuant to 15 U.S.C. § 1640(a).

### Second Cause of Action
*Violation of Real Estate Settlement Procedures Act (RESPA)*
(against all Defendants)

63. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

64. RESPA prohibits accepting "unearned fees," including "any portion, split, or percentage of any charge made or received from the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

65. In providing mortgages to Plaintiff and the Class, Defendants rendered real estate settlement services in connection with a transaction involving a federally-related mortgage loan.

66. In charging rate lock extension fees due to lender-caused delays, Defendants violated RESPA by accepting and splitting an unearned settlement service fee. The fee was not

charged for a service actually performed, but rather was charged because Wells Fargo could not timely process mortgage applications or complete the underwriting process.

67. The fee was not bona fide compensation for services actually performed because Defendants' own actions necessitated extending the rate lock period.

68. As a result, Plaintiff and the Class are entitled to damages of three times the amount of rate lock extension fees, attorneys fees, and costs, pursuant to 12 U.S.C. § 2607(d).

**Third Cause of Action**
*Violation of California's Unfair Competition Law (UCL)*
(against all Defendants)

69. Plaintiff incorporated by reference all allegations, as if fully set forth herein.

70. Defendants violated the UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*, by engaging in unfair and unlawful business acts and practices.

71. Defendants' conduct constitutes an unfair practice, within the meaning of the UCL, because their conduct was unscrupulous and caused substantial harm. This conduct includes fostering a corporate culture where fraud is encouraged, blaming customers for delays in the mortgage application process that were actually Defendants' or their affiliate's fault, and charging rate lock extension fees to customers despite Wells Fargo's fault in failing to close the mortgage by the rate lock expiration deadline. Customers were harmed by being forced to pay fees for delays for which Wells Fargo was responsible and being forced to provide redundant paperwork to Wells Fargo that they had already previously provided. As Wells Fargo's acts and practices had no utility, the harms stemming from Wells Fargo's conduct outweigh the conduct's utility.

72. The conduct described above is additionally unfair because it violates the policy and spirit of TILA and RESPA, as outlined above.

73. Additionally, Defendants' conduct is unlawful, within the meaning of the UCL, because it violates TILA and RESPA, as outlined above.

74. Plaintiff and the Class were injured and lost money or property as a result of Defendants' unfair and unlawful acts and practices. Plaintiff seek injunctive relief as well as restitution, including of amounts they paid to Defendants in the form of rate lock extension fees.

**Fourth Cause of Action**
*Violation of New Jersey's Consumer Fraud Act (CFA)*
(against all Defendants)

75. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

76. The CFA prohibits the use of "any unconscionable commercial practice" in connection with the sale of real or personal property, or services, or with respect to subsequent performance thereof. N.J.S. § 56:8-2.

77. One way a practice can be deemed "unconscionable" under the CFA is if it violates the set of regulations that have been promulgated pursuant to the CFA. Regulatory violations are treated as strict liability under the CFA.

78. One regulation promulgated pursuant to the CFA regulates sellers of services related to residential renovations. Defendants sell mortgage services as part of construction and renovation loans. *See* N.J. A.D.C. § 13:45A-16.2.

79. The regulation requires sellers to disclose, as part of their offered price, all finance charges, obligations, costs or fees to be paid. *See* N.J. A.D.C. § 13:45A-16.2(a)(6)(viii).

80. In not disclosing the possibility, likelihood, existence, or amount of charges for rate lock extensions, Defendants failed to include, in their offered price, all finance charges, obligations, costs or fees to be paid as part of the transaction.

81. Plaintiff and the Class suffered an ascertainable loss as a result of Defendants' failure to disclose in its mortgage applications the possibility, likelihood, existence, or amount of rate lock extension fees.

82. As a result, Plaintiff and the Class are entitled to treble damages, including three times the amount of extension fees, and attorneys' fees plus costs, pursuant to N.J.S. 56:8-19.

**Fifth Cause of Action**
*Unjust Enrichment*
(against all Defendants)

83. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

84. Defendants were unjustly enriched at the expense of Plaintiff and the Class through payment of fees wrongly charged to extend mortgage interest rate locks.

85. Under the circumstances, it would be inequitable and against good conscience to

permit Defendants to retain the ill-gotten benefits that they received from Plaintiff and the Class from unjustly charging them for rate lock extensions.

86. Plaintiff and the Class seek restitution and/or disgorgement of fees that Defendants received from charging for extensions of locked interest rates.

### Sixth Cause of Action
*Breach of Covenant of Good Faith and Fair Dealing*
(against all Defendants)

87. Plaintiff incorporates by reference all allegations, as if fully set forth herein.

88. Plaintiff and the Class entered into contracts with Defendants to secure mortgages, and performed all their material obligations under the contracts.

89. Implied in all contracts is an implied covenant, imposing a duty on the parties to act in good faith and deal fairly with one another.

90. In charging Plaintiff and the Class to extend locked interest rates when Defendants were responsible for delays necessitating the extension, Defendants breached its duty of good faith and fair dealing, acting contrary to the spirit and intention of the mortgage contracts.

91. Wells Fargo's knew or should have known of its policy or practice of shunting rate lock extension fees on faultless borrowers, and used borrowers' lack of knowledge about this policy and practice to Defendants' advantage.

92. Defendants also acted in bad faith by foisting rate lock extension fees on borrowers, who faced higher interest rates or having a home purchase fall through if they did not pay the extension fees.

93. Additionally, by omitting rate lock extension fees from its disclosures of estimated closing costs, Defendants did not act in good faith and did not deal fairly with borrowers, inducing them to rely on an estimate that hid probable fees.

94. By disclosing timelines for closing that were unrealistic, given how long it took Defendants to process loan applications, Defendants acted in bad faith. Defendants did not deal fairly with Plaintiff and the Class by relying on unrealistic timelines in determining their initial rate lock period.

95. As a result of Defendants' breach of the covenant of good faith and fair dealing,

Plaintiff and the Class were harmed, including by foregoing the right to get a locked in interest rate without paying additional fees.

96.     Plaintiff and the Class sustained damages in an amount to be determined by this Court, including interest and attorneys' fees. Plaintiff and the Class also seek restitution and disgorgement of profits relating to charges for rate lock extension fees and/or declaratory relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Brian Brach, on behalf of himself and the Class, seek the following relief:

A.  An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing Gibbs Law Group LLP as Class Counsel, and finding that Plaintiff is a proper representative of the Class;

B.  Declaratory relief, declaring Defendants' actions unlawful;

C.  Injunctive relief, including an order prohibiting Defendants from charging any further rate lock extension fees for lender-caused delays;

D.  Compensatory, statutory, treble, or other damages, restitution, disgorgement, attorneys' fees, statutory costs, and such other relief as is just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

DATED: October 19, 2017                                  ___/s/ Eric. H. Gibbs_____
                                                                           Eric H. Gibbs

**GIBBS LAW GROUP LLP**
Eric H. Gibbs (SBN 178658)
Michael L. Schrag (SBN 185832)
Amy Zeman (SBN 273100)
Aaron Blumenthal (SBN 310605)
505 14th Street, Suite 1110
Oakland, CA  94612
Telephone:  510-350-9700
Facsimile:  510-350-9701
ehg@classlawgroup.com
mls@classlawgroup.com
amz@classlawgroup.com
ab@classlawgroup.com